# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
### FORT SMITH DIVISION

| | |
|---|---|
| THE ESTATE OF LARRY EUGENE PRICE JR, by and through its Special Administrator, Rodney Price,<br><br>PLAINTIFF,<br><br>v.<br><br>TURN KEY HEALTH CLINICS, LLC, an Oklahoma corporation; SEBASTIAN COUNTY, ARKANSAS; JAWAUN LEWIS, DO; CHRISTEENA FERGUSON; and J. DOES 1-20,<br><br>DEFENDANTS. | **No.** 2:23-cv-02008-PKH<br><br>(JURY DEMAND) |

## PLAINTIFF'S ORIGINAL COMPLAINT

## I.    INTRODUCTION

1.      On August 19, 2020, Larry Eugene Price Jr., a 50-year-old developmentally disabled Black man, was suffering from an acute mental health crisis when he was arrested in Fort Smith, Arkansas, and taken to the Sebastian County Jail. Because he couldn't afford the $1,000 bail that would've allowed him to remain free as he awaited his day in court, Mr. Price spent the next year in jail, not convicted of any crime, just waiting. For most of that year, despite his dire need of urgent psychiatric care, Mr. Price languished alone in solitary confinement—in a state of active psychosis—neglected by jail medical and custody staff.

2.      Because of his unaddressed mental health needs, Mr. Price barely ate or drank. Jail medical and custody staff were aware of his grossly insufficient food and water intake. They even took a few perfunctory steps to address the crisis in February through April 2021 by sporadically

1

monitoring his food and fluid intake; however, they quickly abandoned their minimal efforts. Instead, they ignored his life-threatening condition altogether and simply watched from the sidelines as he steadily decompensated. In the last months of his pretrial confinement, Mr. Price was so visibly emaciated that he resembled a victim of famine.

3.      In the early morning hours of August 29, 2021, just over one year after his arrest, a corrections officer found Mr. Price in his isolation cell, lying in a pool of standing water and urine, unresponsive. He was transported to Mercy Hospital by Fort Smith EMTs, where he was pronounced dead. An autopsy performed by the Arkansas State Medical Examiner's office found that he died from acute dehydration and malnutrition.

4.      When Mr. Price entered the jail, he was a well-nourished, 6'2" tall man who weighed 185 pounds. When EMTs transported him to the hospital, they estimated his weight to be 90 pounds. Photographs taken on the day of his death show Mr. Price's morbidly skeletal appearance:



5.      There is no excuse for an atrocity like this to happen to a mentally ill man in an American jail. None. In addition to acute dehydration and malnutrition, the medical examiner observed the profoundly shrivelled (or pruned) condition of the soles of Mr. Price's feet. The

following photograph, taken at Mercy Hospital shortly after his death, depicts this shocking observation:



6.      Mr. Price's grotesquely wilted skin was caused by "prolonged moisture exposure" from the pool of contaminated water on the concrete floor and bunk of his solitary confinement cell. The United States Constitution has long prohibited inhumane conditions of confinement like this. In addition to being cruel and unusual, it was also hazardous. In fact, because of the pooled water in Mr. Price's cell, the jail's first responding officers opted not to use the readily available electronic defibrillator, which might have saved Mr. Price's life.

7.      Larry Price suffered in the tortured throes of his untreated mental disorder for months on end as jail healthcare and security staff watched him waste away—apathetic to his life-threatening medical and mental health needs and to the cruelty of his confinement. He died not only because of their deliberate indifference and neglect, but also because of systemic deficiencies in the Sebastian County Jail's policies and practices, which put severely mentally ill people at significant risk of serious harm or death. The constitution mandates better treatment of society's most vulnerable citizens.

8. Mr. Price's estate brings this federal civil rights action under 42 U.S.C. § 1983 to redress the violation of his constitutional rights and to hold the defendants accountable for his unnecessary pain and suffering, the loss of his life, and the grief and anguish of his surviving family members.

## II. JURISDICTION AND VENUE

9. This Court has original subject matter jurisdiction over Plaintiff's civil rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

10. Venue in this forum is proper under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiff's legal claims occurred in this judicial district.

## III. PARTIES

11. Plaintiff is the Estate of Larry Eugene Price Jr., formed under Arkansas law and acting through its court-appointed Special Administrator, Rodney Price. Larry Price was a citizen of the United States and a resident of Fort Smith, Arkansas, when he died at the Sebastian County Adult Detention Center (commonly known as the Sebastian County Jail) on August 29, 2021. Prior to his death, Mr. Price was awaiting his day in court—having neither been tried nor convicted of the alleged crime for which he was arrested. As a pretrial detainee, he was entitled to the protections afforded by the Fourteenth Amendment to the United State Constitution.

12. Defendant Turn Key Health Clinics, LLC ("Turn Key") is a private, for-profit correctional healthcare corporation based in Oklahoma and doing business in Arkansas. Turn Key is considered a "person" for purposes of 42 U.S.C. § 1983. At all relevant times, Turn Key acted under color of state law and pursuant to a contract with Sebastian County to provide necessary medical and mental health services to people confined at the Sebastian County Jail. Turn Key was

responsible for adopting, implementing, and enforcing policies pertaining to medical and mental health care for people confined at the jail. It also was responsible for ensuring that the care provided to those people met minimum constitutional standards and for ensuring that its staff and contractors were adequately trained to provide care that met those standards.

13.     Defendant Sebastian County is a municipal corporation, organized under the laws of the State of Arkansas. Sebastian County is a "person" for purposes of 42 U.S.C. § 1983. At all relevant times, the County owned and operated the Sebastian County Jail. Acting through the Sebastian County Sheriff's Office, the County was responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies; and for ensuring that the people in its custody received necessary medical and mental health care, as required under the United States Constitution and other laws. Although Sebastian County sought to offload its jail medical operations by contracting with Turn Key, it remains liable for any negligence or unconstitutional policies or practices that resulted in harm to any person confined in the jail.

14.     Defendant Jawaun Lewis, DO is a psychiatrist who, on information and belief, resides in Oklahoma. Defendant Lewis is Turn Key's Chief Mental Health Officer and is responsible for creating and implementing Turn Key mental health policy and for providing psychiatric services to people confined at Sebastian County Jail, including Larry Price. At all relevant times, Defendant Lewis was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

15.     Defendant Christeena Ferguson is a nurse who, on information and belief, resides in Missouri. Defendant Ferguson was an employee of Defendant Turn Key and was responsible for providing medical services to people confined at the Sebastian County Jail, including Larry

Price. At all times relevant to this action, Defendant Ferguson was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in Arkansas and in this judicial district.

16.     Defendants J. Does 1-20 were, at all times relevant to this case, correctional officers or medical staff at the Sebastian County Jail and employees or subcontractors of either the Sebastian County Sheriff's Office or Turn Key. In those roles, they were responsible for the health, safety, security, and welfare of people confined in the jail, including Mr. Price. At all relevant times, these defendants (whose identities are currently unknown) were acting under color of state law. Regardless of their place of residence, the allegations against these defendants arise from their actions in Arkansas and in this judicial district.

### IV.     FACTS

#### A.     <u>Facts Applicable to All Defendants</u>

17.     Larry Eugene Price Jr. was a severely mentally ill man, living below the poverty line in Fort Smith, Arkansas, often homeless. Among other mental health disorders, Mr. Price suffered from paranoid schizophrenia, which caused him to experience delusions, visual and auditory hallucinations, disordered thinking, and severe agitation. It was not uncommon for him to suffer from bouts of psychosis and to completely lose touch with reality.

18.     Due to his schizophrenic episodes, Mr. Price had a long history of involuntary commitments (or mental health holds) in state and county mental hospitals—where he would be treated by a team of trained professionals. Once treated and stabilized, Mr. Price would return to the community.

19.     In addition to paranoid schizophrenia, Mr. Price also suffered from intellectual developmental disorder, a developmental disability that significantly impaired his intellectual and

adaptive functioning. He had an IQ of under 55. He was unmarried, unemployed, homeless, and disabled.

20.     On August 19, 2020, Mr. Price walked into the Fort Smith Police Department and began acting irrationally. He yelled and cursed at officers and shouted incoherently. At some point, he held out his plainly empty hand as if he was holding a gun and used his index finger to pull an imaginary trigger while verbally threatening officers.

21.     Fort Smith police officers immediately recognized Mr. Price, who visited the police station almost every day—often several times a day. It was not unusual for him to be agitated and irrational or to engage in bizarre behavior during these visits. According to a police incident report, it was "common for him to come inside and shout profanities or otherwise behave chaotically." On this day, an officer tried to calm Mr. Price down by offering him a bottle of water, but that did not work. Mr. Price refused to leave when asked to do so, and one of the two officers at the station decided to radio for backup assistance. The officer did so out of "concern for [Mr. Price's] wellbeing" and "potentially" the wellbeing of others. The officer felt that it would be in Mr. Price's "own best interest" to have officers "place him under arrest or otherwise try to calm him."

22.     Mr. Price was taken to the Sebastian County Jail, where he was booked shortly before 7:00 p.m. For his behavior at the police station—behavior that was clearly an expression of his mental illness—Mr. Price was somehow charged with "terroristic threatening in the first degree." His bail was set at $1000.

23.     At the time of his August 19, 2020 booking, Mr. Price was physically healthy and well-nourished. He stood 6'2" tall and weighed 185 pounds. However, his mental health needs were serious and readily apparent.

24.     Sebastian County Jail medical and security staff were familiar with Mr. Price and knew that he had a history of serious mental illness. He had been detained in the jail multiple times in 2019 and in the first part of 2020, typically for disorderly conduct and trespass-related charges. From these previous detentions, jail staff knew that Mr. Price suffered from paranoid schizophrenia and had serious mental health needs. In fact, Mr. Price had just been detained in the Sebastian County Jail from July 7 to August 11, 2020. Records from that recent pretrial detention indicate that he was hearing voices, delusional, depressed, disoriented, confused, speaking rapidly, experiencing psychomotor agitation, and struggling to understand his surroundings. His mental symptoms were described as "severe" and likely to have a "[m]arked impact on [his] ability to function satisfactorily in the [jail] setting." Mr. Price was prescribed antipsychotic medication to help stabilize him during that relatively short detention.

25.     Sebastian County Jail policymakers knew the jail was not equipped to safely manage a patient like Mr. Price on a long-term basis. It did not have sufficient staffing or training to provide him with safe, effective care. Because of his extremely severe mental health needs, and the jail's lack of capacity to meet those needs, it was foreseeable that in this setting, he would decompensate over time and would be at substantial risk of serious harm or death.

26.     One week after being released from his previous pretrial detention, Mr. Price was back at the jail. Within hours of his August 19, 2020 booking, Mr. Price was moved into a segregated housing area due to his "current level of thinking." He would remain in this segregated housing area, in solitary confinement, for the entirety of his yearlong pretrial detention—23 to 24 hours a day, seven days a week.

27.     Two days after his booking, on August 21, 2020, an intake medical screening nurse from Turn Key noted Mr. Price's history of mental illness and put him on the list for an "urgent"

mental health referral. However, the scheduled mental health visit did not take place because Mr. Price "refused" to see the provider. During the first week of his confinement, Mr. Price was also scheduled for an initial chronic care evaluation. However, the evaluation did not occur because Mr. Price was agitated, uncooperative, talking loudly over everyone, and displaying aggressive behavior.

28.    On the afternoon of August 23, 2020, a Sebastian County jail guard observed Mr. Price acting out in his solitary confinement cell—yelling, spitting, disobeying orders, and throwing trash around. Because of this, Mr. Price was denied his one-hour out-of-cell time for that day.

29.    On the morning of August 28, 2020, Mr. Price was sent to the ER due to rectal bleeding and a possible anal prolapse. He was diagnosed with hemorrhoids, treated, and returned to the jail that afternoon. During a post-ER assessment by Turn Key medical staff, Mr. Price was reportedly confused, spoke in unintelligible sentences, and began "barking" at jail personnel. A Turn Key nurse scheduled him for another "urgent" mental health referral.

30.    Defendant Jawaun Lewis, DO, Turn Key's Chief Mental Health Officer, visited Mr. Price on September 1, 2020. Dr. Lewis was familiar with Mr. Price and had prescribed him antipsychotic medication during his most recent prior detention at the jail. On this September 1st visit, Dr. Lewis noted that Mr. Price was "actively psychotic," delusional, disoriented, disengaged, speaking rapidly, experiencing psychomotor agitation, and unable to provide information. Consistent with Mr. Price's recent prior detention, Dr. Lewis also noted that Mr. Price's mental symptoms were "severe" and had a "[m]arked impact on [his] ability to function satisfactorily in the current setting." As before, Dr. Lewis prescribed him antipsychotic medication.

31.    For the next three months, Turn Key medical staff attempted to administer the prescribed medication to Mr. Price. Sometimes he accepted the medication; but, more often, he

refused to take it. No medical professional attempted to address this inconsistency in a meaningful way, and Mr. Price continued to exhibit increasingly severe symptoms of mental illness. During that time, corrections officers regularly denied his one hour out of solitary confinement due to his erratic behavior, which included spitting, cursing, throwing trash, disobeying orders, flinging feces and bodily fluids, covering his head, rolling around on the floor, barking, rambling incoherently, flooding his cell, and kicking his cell door.

32.     An appointment for Dr. Lewis to follow up with Mr. Price was scheduled for November 24, 2020. Regarding that appointment, Dr. Lewis reported that Mr. Price "refuses to be seen [and] refuses to take meds." In response, Defendant Lewis abruptly discontinued Mr. Price's mental health medications. Despite his knowledge of Mr. Price's serious mental health needs, Dr. Lewis did not issue any orders to jail medical staff to try to address those needs or take any additional measures to deal with the situation.

33.     When it became apparent that Mr. Price was refusing to take his antipsychotic medication, the solution (per the standard of care) was not to simply discontinue his prescription and ignore him. Rather, Dr. Lewis had a duty to determine why Mr. Price wasn't taking his medication and whether this serious issue could be resolved. He should have created a mental health treatment plan to address the situation. If the situation remained unchanged, it was incumbent upon him to determine whether Mr. Price was fit for continued confinement in the Sebastian County Jail. If not, Dr. Lewis should have ordered his transfer to an appropriate facility.

34.     After abruptly discontinuing his prescriptions on November 24, 2020, Dr. Lewis never made any effort to follow up with Mr. Price or to address his serious mental health needs. Consequently, despite his severe mental illness, Mr. Price received no additional psychotropic

10

medication at the jail for the remaining nine months of his pretrial detention. Nor did he receive any other mental health treatment or care during that time.

35.     Predictably, Mr. Price continued to deteriorate. In December 2020, for example, jail guards documented him throwing feces and refusing to leave his solitary confinement cell for his one hour out. In addition, Mr. Price began eating and drinking less and less, putting him at risk of life-threatening malnutrition and dehydration.

36.     On January 8, 2021, Mr. Price submitted a sick-call request to medical staff in which he stated, "I am sick and have lost alot of weight[.]  I need to see a doctor." A nursing note indicates that he was unable to get the sick call visit because he was "non-compliant."

37.     Three weeks later, on January 28, 2021, Defendant Christeena Ferguson, a Turn Key nurse, was notified that Mr. Price was eating his own feces and drinking his own urine. She went to check on him and saw that he was "noticeably thinner." In response, she instructed custody staff to weigh him and start a food and fluid log to monitor his intake and output. Despite a clear duty to do so, there is no indication that she alerted a higher-level provider to this alarming development.

38.     When corrections officers weighed Mr. Price on January 28th per Nurse Ferguson's instructions, he weighed 150 pounds. As noted above, when Mr. Price was booked into the jail, he weighed 185 pounds. Thus, since the beginning of his pretrial detention, Mr. Price had lost 35 pounds. While such a red flag should have triggered an immediate response from the Turn Key medical staff, it did not. Indeed, there is no indication that anything was done by jail medical staff in reaction to Mr. Price's dramatic weight loss. According to the available records, they did not even alert a higher-level medical or mental health provider. Nor did they even bother to weigh Mr. Price again.

39.     In addition, although jail custody staff had been instructed to maintain a daily food and fluid log to monitor Mr. Price's intake and output, they did so only sporadically and infrequently. Over the next three months, between late January and late April 2021, they filled out the required log only once in January, five times in February, twice in March, and seven times in April. Not a single one of these forms was fully completed. Important sections on each log sheet were left blank. Entire shifts frequently made no entries at all. And all officers on each shift failed to track or document Mr. Price's urine output and bowel movements.

40.     Multiple members of the Turn Key nursing staff were aware of these glaring deficiencies, including Defendant Ferguson, but no one intervened to ensure that the appropriate food and fluid monitoring took place. And neither Defendant Ferguson nor any other Turn Key medical providers followed up to address Mr. Price's diminished food and fluid consumption or his extraordinary weight loss. The last food and fluid log was filled out on April 25, 2021. At that point, the monitoring stopped altogether. For the next four months, jail medical and security staff consciously chose to ignore Mr. Price's serious nutritional and hydration needs, putting him at substantial risk of serious harm or death.

41.     In addition to his insufficient food and fluid consumption, Mr. Price continued to manifest signs of serious mental illness. From January through April 2021, he repeatedly refused his one-hour daily reprieve from solitary confinement and continued to act out—spitting and cursing at jail staff, flooding his cell, throwing urine and feces, running around naked, and engaging in other bizarre, erratic behavior.

42.     In May 2021 a Sebastian County Circuit Court judge ordered Mr. Price to undergo a psychiatric assessment to determine whether he had the capacity to form the culpable mental state required to prove him guilty of the crime with which he was charged and to determine whether

he was mentally fit to proceed to trial. That assessment, however, never occurred. And in the months that followed, Mr. Price continued to languish alone in his cell—further descending into the throes of his untreated psychosis.

43.     When a person refuses consent to medical treatment in jail, it is standard practice for the medical staff to fill out a waiver of treatment (refusal) form. The patient is required to sign the form. If the patient refuses to sign the form, then a witness must sign it. In the case of Mr. Price, there are several refusal forms filled out in the first three months of his confinement, between mid-August and mid-November 2020. This suggests that the Turn Key medical staff were at least trying to provide him care. However, in the nine months that followed, no refusal forms were filled out. In other words, the Turn Key staff did not even attempt to provide medical or mental health care to Mr. Price during the majority of his pretrial detention.

44.     Throughout June and July 2021, Mr. Price continued to deteriorate. He remained unmedicated and untreated, locked in a solitary cell, completely neglected by the Turn Key medical and mental health staff. He continued to engage in bizarre behavior—banging on walls, yelling nonsensically, throwing feces and trash, eating Styrofoam food cartons, and declining to leave his isolation cell for his one hour out. Moreover, Mr. Price was not consuming enough food or drinking enough water to sustain human life.

45.     By August 1, 2021, it was obvious that Mr. Price was suffering from a life-threatening medical emergency. Seven months earlier, in late January 2020, he had already lost 35 pounds and Defendant-Nurse Ferguson observed that he was "noticeably thinner." By August 2021, he did not appear merely "thinner." Instead, he appeared severely anorexic. Mr. Price was so grossly emaciated that his bones were jutting out. He was visibly malnourished and starving to death.

13

46.     Mr. Price's skeletal appearance did not go unnoticed. In fact, because he was locked in a segregated housing unit for mental health reasons, jail policy strictly mandated custody staff to check on his wellbeing every 15 minutes or more. These wellbeing checks required guards to conduct direct visual observations of him. Throughout his confinement, Sebastian County Jail corrections officers documented these checks on Mr. Price at least four times an hour—usually more. Thus, unless they were falsifying their documentation (and not actually conducting the wellbeing checks), they were well aware of Mr. Price's emaciated, malnourished appearance. Yet not one of them summoned medical help, alerted a supervisor, or even documented his sickly condition in their watch log entries.

47.     In the early morning hours of August 29, 2021, Sebastian County Jail corrections officers discovered Mr. Price lying his isolation cell, unresponsive, in a pool of standing water and urine. His eyes were wide open, he had dried saliva in the corners of his mouth, and he was not breathing. Incredibly, there was not a single nurse or medical provider stationed at the jail at this time.

48.     After determining that Mr. Price did not have a pulse, custody staff called for an ambulance and began CPR. According to investigative records, jail staff was not able to use the readily available automated external defibrillator (AED) due to safety concerns—because of the large amount of standing water in the cell—diminishing their chances of saving Mr. Price's life. The contaminated standing water was not just on the cell floor: Mr. Price's concrete bunk was also "saturated in water and urine." In addition, his solitary cell was littered with trash and multiple uneaten Styrofoam food cartons.

49.     In addition to the trash and food cartons, there was also disturbing and unintelligible writing on the walls of Mr. Price's cell, including a Nazi swastika on his cell door. It is not clear

who drew this symbol of hate on Mr. Price's door, but the jail should not have allowed it to remain there.

50.     When Fort Smith EMTs arrived at the scene, they described Mr. Price laying supine on the water-soaked floor with fire and jail staff at his side. They observed Mr. Price to be visibly "very malnourished" and described his fingers and toes to be "wilted" from being "submerged in standing water for a long period of time." Jail personnel told them that "they have had an issue with the patient's malnutrition."

51.     Based on Mr. Price's appearance, Fort Smith EMTs estimated his weight to be 90 pounds.

52.     Mr. Price was transported to Mercy Hospital, where he was pronounced dead on arrival. Like Fort Smith EMTs, hospital personnel estimated Mr. Price's weight to be 90 pounds. The attending physician diagnosed Mr. Price with cachexia, a wasting syndrome that leads to loss of skeletal muscle and fat.

53.     The following is a photograph of Mr. Price's backside that was taken by state police detectives at Mercy Hospital:



54.     And here is a photograph taken at the hospital by police detectives of Mr. Price's emaciated lower body:



55.     Hospital medical providers documented severe "pruning" and "water logging" on the soles of Mr. Price's feet. The following photograph taken by police detectives depicts this disturbing observation:



56.     The medical examiner who examined Mr. Price's body concluded that his death was caused by "acute dehydration and malnutrition." His autopsy report describes Mr. Price's body as "cachectic with prominent bony structures of the chest and back being visible." It further

describes Mr. Price's eyes as being "sunken in their orbital sockets" and his "clavicles and ribcage skeletal structures [as] being prominent." The following is a photograph he took of Mr. Price as part of his forensic exam:



57.    After describing Mr. Price's "sunken" eyes and the "prominent" bony structures of his upper body, the Medical Examiner documented both his emaciated legs and the lack of subcutaneous fat in his buttocks. In addition to finding overwhelming evidence of malnutrition, the Medical Examiner found fluid samples extracted from Mr. Price's body to be consistent with acute dehydration.

58.    The medical examiner also documented "prolonged moisture exposure type wrinkling" to the palms of Mr. Price's hands and the soles of his feet caused by the standing water in his cell.

59.    The condition of Mr. Price's body and his cell are highly significant because it raises serious questions about the repeated "wellbeing" checks that county corrections officers

purportedly conducted throughout his confinement and, in particular, in the hours leading up to his death.

60.     The Sebastian County Jail utilized an electronic monitoring program, known as the "Guardian" system, to conduct and document their visual wellbeing checks. Computer-generated printouts of these checks, which Mr. Price's estate obtained through public records requests, reveal exactly when guards made their checks and what they supposedly saw. Between August 1 and August 29, 2021, jail guards logged over 4,000 consecutive wellbeing checks of Mr. Price, and each time they made the exact same entry: "Inmate and Cell OK."

61.     One after another, in shift after shift, corrections officer entrusted with Mr. Price's care made this identical entry. In the last 48 hours of Mr. Price's confinement, alone, they made this entry more than 300 successive times. They continued to log these same words, at least four times an hour, even in the hours and minutes leading up to his death—when Mr. Price was visibly malnourished, dying of starvation and dehydration, and laying in a cell saturated with standing water and urine.

62.     Indeed, in post-death interviews, Sebastian County jail guards openly admitted their awareness of Mr. Price's condition. For example, when asked by detectives whether he was aware of any medical problems that Mr. Price may have had, one corrections officer responded: "Just the malnutrition." Another answered, "I just know he wasn't really eating." And another conceded that Mr. Price looked "really malnourished" and "like he lost a ton of weight." One of them even took some responsibility:

> Now, there's supposed to be a food log kept up and, you know, it's been off and on and … that's been a thing. When I say off and on, I mean off and on as far as how much is done compared to how it should have been. I'm at fault for that just as much as anybody else is.

The same officer added that "getting [Mr. Price] the help he needed took a long time and ultimately we didn't get to [it]."

63.    These corrections officers and many others knew of Mr. Price's serious medical and mental health needs and consciously chose to disregard them. Throughout Mr. Price's yearlong detention, multiple corrections officers violated their obligation to visually check on Mr. Price's wellbeing every 15 minutes. These corrections officers documented their wellbeing checks when they either (a) didn't do them at all, and/or (b) did them in such a substandard manner that they may as well have not done them.

64.    The failure to conduct meaningful wellbeing checks of Mr. Price was particularly glaring in the weeks, days, and hours leading up to his death—when he was suffering from obvious and objectively serious medical and mental health conditions. During that time, Mr. Price was so emaciated that he resembled a starving prisoner of war. Jail staff knew he was malnourished and had lost a substantial amount of weight. They also knew he was being housed in inhumane conditions of confinement, in a solitary cell that was filthy, littered with uneaten food cartons, and saturated with contaminated water. Yet, despite Mr. Price's grossly malnourished appearance, and the fact that he was lying in a mixture of standing water and bodily fluids, guards continued to log the same words, "Inmate and Cell OK," over and over—when it was obvious that Mr. Price and his cell were far from "OK." This was a serious breach of their correctional duties and a deviation from the standard of care. Indeed, every corrections officer who saw Mr. Price's condition and the condition of his cell was deliberately indifferent to his serious medical and mental needs and acted in violation of their professional standards of care.

65.    Months earlier, custody staff had been instructed to monitor Mr. Price's food and fluid intake and output because he wasn't eating or drinking enough and had lost 35 pounds of

body weight. Yet, they failed to follow these important instructions, filling out the required log sporadically, infrequently, and only for a few months. Thereafter, they inexplicably stopped the monitoring altogether. This, too, was a serious breach of their duties and a departure from the standard of care. Custody staff also acted with deliberate indifference to Mr. Price's serious medical and mental health needs and in violation of professional standards of care by violating their basic gatekeeping duty to summon help from qualified medical and mental health providers.

66.     Like the county custody staff, the Turn Key medical and mental health staff knew of Mr. Price's serious medical and mental health needs and consciously chose to disregard them. This includes Turn Key's Chief Mental Health Officer, Defendant Lewis, a company policymaker who was familiar with Mr. Price's serious mental health needs from a prior detention. He was personally aware that in September 2020, Mr. Price was "actively psychotic" and profoundly mentally ill. He specifically observed that Mr. Price's mental symptoms were "severe" and had a "[m]arked impact on [his] ability to function satisfactorily in the current setting." Yet, knowing this, he abruptly discontinued Mr. Price's antipsychotic medication two months later and ignored him for the next nine months. This constituted conscious indifference to Mr. Price's serious mental health needs and put him at substantial risk of serious harm and death.

67.     Likewise, Defendant Ferguson was well aware of Mr. Price's serious medical and mental health needs. In January 2020, she was informed that Mr. Price was eating his own feces and drinking his own urine. This alone triggered a duty on her part to alert a higher-level provider, which she failed to do. In addition, she personally saw that Mr. Price was "noticeably thinner" and instructed custody staff to weigh him and monitor his fluid and food input and output. She knew that by then, her patient had already lost at least 35 pounds. When custody staff failed to comply with her important instructions, she inexcusably took no further steps to get Mr. Price the care he

obviously needed. This reflected her deliberate indifference to Mr. Price's objectively serious needs.

68.     Defendant Ferguson was not the only member of Turn Key's nursing staff who knew of Mr. Price's serious medical and mental health needs. Like her, other Turn Key nurses were aware of Mr. Price's dramatic weight loss and of her instructions to the custody staff to monitor his food and fluid intake/output. Like her, multiple other Turn Key nurses knew that the custody staff were largely ignoring these important instructions. And like her, multiple other Turn Key medical staff members ignored Mr. Price's potentially life-threatening medical and mental health needs for months on end, in plain violation of their professional obligations.

69.     Mr. Price suffered from objectively serious medical and mental health conditions throughout his confinement. Numerous Sebastian County and Turn Key agents and employees acted with deliberate indifference to those serious needs, in violation of the U.S. Constitution and their professional standards of care. These agents and employees had a constitutional and professional duty to act when they became aware of Mr. Price's objectively serious medical and mental health needs. Their failure to do so put him at substantial risk of serious harm and caused or contributed to his unnecessary pain, suffering, and death.

70.     The individual defendants (including those not yet named) acted with intent, malice, deliberate indifference, and/or reckless disregard to Mr. Price's federal constitutional rights and caused the damages described in this complaint. The individual defendants (including those not yet named) had a duty to act reasonably, in accordance with the standards of care governing their work. Their conduct constituted a breach of the governing standards of care and caused Mr. Price harm, including unnecessary pain, suffering, and death.

**B.**    <u>**Additional Facts Pertaining to Corporate and County Liability**</u>

71.     The unconstitutional conduct alleged in this complaint was carried out in accordance with the official policies and/or longstanding customs and practices of Turn Key Health and Sebastian County.

72.     As set forth above, some of the unconstitutional acts in this complaint were committed by Turn Key's Chief Mental Health Officer, Defendant Jawaun Lewis. Because Dr. Lewis was a Turn Key policymaker, his unconstitutional actions are imputed to Turn Key as a matter of law.

73.     Defendant Turn Key also permitted to exist unconstitutional customs and practices with regard to persons detained at the Sebastian County Jail with serious medical and mental health needs. These customs and practices included failing to provide necessary treatment to patients suffering from serious mental and physical illnesses, failing to adequately monitor patients suffering from serious medical and mental conditions, delegating responsibility for monitoring patients with serious medical and mental health needs to corrections officers who were not adequately trained or qualified for that task, and allowing severely mentally ill individuals to be confined at the jail despite the insufficient resources to adequately care for them. These customs and practices subjected patients with serious medical and mental health needs to a substantial risk of suffering serious harm and resulted in Mr. Price's suffering and death.

74.     Defendant Turn Key failed to adequately train and supervise its staff to ensure that persons confined in segregation cells with serious mental health needs receive necessary treatment. This included failing to train and supervise staff on how to properly monitor and document the condition of mentally ill patients in segregation, when to elevate them to a higher level of care when their condition is not improving, how to respond when they are not ingesting sufficient fluids

or nutrition, and how to effectively address the needs of patients who express refusal to take certain medication or otherwise participate in treatment. Defendant Turn Key had notice of these failures and knew that they subjected patients with serious mental illness to a substantial risk of suffering serious harm, but it did not correct the failures. These failures resulted in Mr. Price's suffering and death.

75.    Defendant Sebastian County permitted to exist unconstitutional customs and practices with regard to persons housed in segregation cells with serious medical or mental health needs. These customs and practices included failing to properly monitor and document the conditions and behavior of such persons, falsely documenting wellbeing checks that did not actually occur, and allowing medical staff to delegate responsibility for monitoring patients with serious mental or physical illnesses to corrections officers who were not adequately trained or qualified for that task. These customs and practices subjected patients with serious mental or physical illness to a substantial risk of suffering serious harm and resulted in Mr. Price's suffering and death.

76.    Defendant Sebastian County failed to adequately train and supervise its staff to ensure that persons confined in segregation or observation cells with serious medical or mental health needs received necessary treatment. This included failing to train and supervise staff on how to properly monitor and document the condition of persons in segregation or observation cells, how to recognize when such persons need medical or mental health attention, what to do if a person in custody is not receiving adequate medical or mental health care, and how to respond to situations where a person in custody was not ingesting sufficient food or fluids to meet their nutritional and hydration needs. Defendant Sebastian County had notice and was aware that these failures subjected people in its custody with serious mental or physical illness to a substantial risk of

23

suffering serious harm, but it did not correct the failures. These failures resulted in Mr. Price's suffering and death.

77.     As noted above, Sebastian County corrections officers were required to monitor Mr. Price's wellbeing by conducting direct-view checks of him at least once every 15 minutes. Officers documented thousands of such checks in the months, weeks, days, and hours leading up to Mr. Price's death, using the same boilerplate phrase each time: "Inmate and Cell OK." They used this phrase when the obviously malnourished Mr. Price lay dying, in a pool of contaminated standing water. They continued to use this phrase even after he was discovered unresponsive, while he was being transported to the hospital, and during his time in the ER. Shockingly, they made at least ten additional entries, "Inmate and Cell OK," *after* Mr. Price was pronounced dead. While this is evidence of their deliberate indifference, it is also a telltale sign of glaring systemic deficiencies. When something like this happens so blatantly and pervasively, and for such a long period of time, it is almost always a system-wide problem. Based on these facts, it is reasonable to infer the existence of unconstitutional practices and customs, profound training deficiencies, grossly inadequate staffing, overcrowding, and a reckless lack of supervision.

78.     In the decade leading up to Mr. Price's pretrial detention, the State of Arkansas conducted annual inspections of the Sebastian County Jail. Each year between 2009 and 2019, state inspectors identified dangerous deficiencies related to overcrowding, understaffing, and inadequate space. In one inspection after another, they found the jail to be overpopulated with inmates, insufficiently staffed, and in need for additional space. The annual inspection reports repeatedly warned Sebastian County that a sufficient staff level is necessary for emergency preparedness, cell check protocols, employee training needs, and other duties. The yearly reports

also repeatedly found that due to the "lack of space," the jail "often struggles as staffers work to house inmates with disabilities and special needs."

79.     In 2020, state officials were unable to conduct an in-person review because of the pandemic and had to inspect the jail via electronic means. Even with a remote inspection, the state found the Sebastian County Jail to be "out of compliance" because of its insufficient staffing. And in 2021, the year of Mr. Price's death, state inspectors found that the jail was "still in need of sufficient staff level" and that the "operational demands far exceed[ed] the jail's space and capacity." Yet again, the inspection report documented the jail's "struggles" to safely "house inmates with disabilities and special needs."

80.     These glaring deficiencies put Sebastian County Jail inmates at substantial risk of serious harm or death. Yet, despite over a decade of written warnings, Sebastian County officials failed to fix the persistent problems. Mr. Price's suffering and death was a foreseeable consequence of this failure.

81.     Defendants Sebastian County and Turn Key maintained a custom of accepting new detainees, including those with acute mental illness, without making any effort to determine whether the jail could provide them with constitutionally adequate mental health care while in custody. They also maintained a custom of continuing to confine people even after it became apparent that their acute mental health needs were greater than what the jail's custody and medical staff could safely and adequately address.

82.     Sebastian County and Turn Key officials were aware that the jail was not equipped to safely detain people with severe mental illness on a long-term basis. Instead of transferring such individuals to appropriate facilities that were equipped to care for them, however, it was the longstanding practice of Sebastian County and Turn Key to house these severely mentally ill

people, including many pretrial detainees who had not been convicted of any crimes, in segregation cells where they would remain locked up alone for 23-24 hours a day, seven days a week, often for lengthy periods of time—without any meaningful mental health care. This practice was reckless and dangerous and put severely mentally ill people, like Mr. Price, at substantial risk of serious harm. Indeed, it has long been understood in the field of corrections that solitary confinement carries risks of psychiatric decompensation. This is true even people without mental illness. It is particularly true for persons, like Mr. Price, with preexisting psychosis and severe mental illness.

83.     Following Mr. Price's death, all of the information described in this complaint was available to Sebastian County and Turn Key officials. They knew of Mr. Price's serious mental health needs. They knew he received no medication from November late 2020 to late August 2021. They knew that during this nine-month timeframe, he was not seen by a single psychiatrist or mental health provider. They knew of his inadequate food and fluid intake and his dramatic weight loss. They knew that his weight loss was ignored for months on end by custody and medical staff. And they knew that Mr. Price died of acute dehydration and malnutrition. In addition, they had photographic evidence of the skeletal condition of his body and the unnatural, waterlogged appearance of his hands and feet from prolonged moisture exposure. Despite all of this knowledge, they took no corrective or remedial action. No one was terminated, disciplined, counseled, or even warned, and no policy changes were made.

84.     All acts and omissions committed by Defendants Sebastian County and Turn Key were committed with intent, malice, and/or with reckless disregard for Mr. Price's constitutional rights. These defendants knew or should have known that their conduct, and the conduct of their

employees, would naturally and probably result in injury or damage. Nevertheless, they continued the conduct with malice, deliberate indifference, and/or reckless disregard of the consequences.

85.    Defendants Sebastian County, Turn Key, and the employees and agents of both entities had a duty to treat Mr. Price in accordance with the applicable standards of medical and correctional care. Defendants repeatedly breached those duties, directly and foreseeably resulting in Mr. Price's damages, including his pain, suffering, and death.

86.    Defendant Sebastian County delegated its constitutional duty to provide persons in its custody with necessary medical and mental health care to Defendant Turn Key. Despite that delegation, Defendant Sebastian County had a continuing, non-delegable duty to ensure that its contracted jail medical provider was providing constitutionally adequate care to those in its jail. Defendant Sebastian County adopted and ratified Defendant Turn Key's policies, customs, and practices as its own. As such, Defendant Sebastian County is liable for any unconstitutional Defendant Turn Key policies, customs, or longstanding practices that resulted in harm to any person confined in the jail, including Larry Price.

## V.    CAUSES OF ACTION

### A.    42 U.S.C. § 1983: Violations of the Fourteenth Amendment to the United States Constitution

87.    Based on the allegations in this complaint, all defendants are liable under 42 U.S.C. § 1983 for violating Larry Price's rights under the Fourteenth Amendment to the United States Constitution. This includes depriving Mr. Price of his right to necessary medical and mental health care, which caused him avoidable pain and suffering during his detention at the Sebastian County Jail and, ultimately, his wrongful death.

88.     The alleged constitutional violations also caused Mr. Price's surviving family members to suffer ongoing mental anguish and grief and destroyed their familial relationship with him.

**B.     Arkansas Wrongful Death & Survival Statutes: Medical Negligence**

89.     As a result of the conduct alleged in this complaint, Defendants Turn Key, Lewis, Ferguson, and the medical providers currently identified as J. Does 1-20 are liable for proximately causing Mr. Price's suffering and death by failing to follow the accepted standards of care. Defendant Sebastian County is likewise liable for the negligent acts and omissions of its corporate agents. These claims, actionable through Mr. Price's estate, are asserted for the benefit of Mr. Price and his surviving mother and siblings under Arkansas' wrongful death and survival statutes, A.C.A. § 16-62-101, *et seq*.

**C.     Arkansas Wrongful Death & Survival Statutes: Violation of Correctional Standards**

81.     Based on the allegations set forth in the complaint, the individual county corrections officer-defendants, identified as J. Does 1-20, are liable for violating their applicable correctional standards of care and negligently causing the death and pre-death pain and suffering of Larry Price. These claims, actionable through Mr. Price's estate, are asserted for the benefit of Mr. Price and his surviving mother and siblings under Arkansas' wrongful death and survival statutes, A.C.A. § 16-62-101, et seq.

## VI.     JURY DEMAND

90.     Plaintiff demands a trial by jury.

## VII.     REQUEST FOR RELIEF

Plaintiff asks the Court to award the following relief:

28

A.      All available compensatory damages, including damages for Mr. Price's mental and physical pain and suffering, the loss of the value of his life, the mental anguish and grief of his surviving siblings and mother, and all other compensatory damages available under state and federal law;

B.      Punitive damages against Defendant Turn Key;

C.      Attorneys' fees and litigation costs; and

D.      Any other relief that the Court deems just and equitable.

DATED this 13th day of January, 2023.

Respectfully submitted,

BUDGE & HEIPT, PLLC

*/s/ Erik J. Heipt*
Erik J. Heipt
Hank Balson
Edwin S. Budge
808 East Roy Street
Seattle, Washington 98102
erik@budgeandheipt.com
hank@budgeandheip.com
ed@budgeandheipt.com
Telephone: (206) 624-3060

Attorneys for Plaintiffs