```
 1                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
 2                       FORT SMITH DIVISION

 3   THE ESTATE OF LARRY EUGENE
     PRICE JR, by and through its Special
 4   Administrator, Rodney Price,                       PLAINTIFF

 5      vs.                           Case No:  2:23-cv-02008-PKH

 6   TURN KEY HEALTH CLINICS, LLC, et al,             DEFENDANTS

 7              The Video-recorded Deposition of:

 8              JAWAUN MICHAEL LEWIS, D.O.
          being taken on November 17, 2023 @ 9:10 a.m.
 9       at the Judge's Room, Courtyard Marriott Downtown,
          900 Rogers Avenue, Fort Smith, Arkansas  72901
10

11   APPEARANCES:                                   ON BEHALF OF:

12   MR. ERIK J. HEIPT                                  PLAINTIFF
     MR. HANK BALSON
13   MR. ED BUDGE (via Zoom)
     Budge & Heipt
14   808 East Roy Street
     Seattle, WA  98102
15
     MS. ALEXANDRA G. AH LOY                          DEFENDANTS
16   MR. ZACHARY WILLIAMS (via Zoom)
     Hall Booth Smith, PC          Turn Key Health Clinics, LLC
17   6301 Waterford Blvd., Ste 200  Jawaun Lewis, D.O.
     Oklahoma City, OK  73118       Christeena Ferguson
18
     MR. JASON OWENS                Sebastian County, Arkansas
19   Jason Owens Law Firm, P.A.
     1312 W. Oak Street
20   Conway, AR  72034

21   Other persons present:  Rodney Price, David Roe, Videographer

22

23              RICK L. CONGDON, ARCCR #631
                  CERTIFIED COURT REPORTER
24                    P. O. Box 8493
                Fort Smith, Arkansas 72902
25   email: rlcongdon@hotmail.com / cell phone: 479-652-0146
```

EXHIBIT 14

1       The video-recorded deposition of JAWAUN MICHAEL LEWIS,
2  D.O. was taken on November 17, 2023, beginning at the hour of
3  9:10 a.m. at the Judge's Room, Courtyard Marriott Downtown, 900
4  Rogers Avenue, Fort Smith, Arkansas, before me, Rick L.
5  Congdon, a Certified Court Reporter, and for the cause now
6  pending in the United States District Court, Western District
7  of Arkansas, Fort Smith Division, said deposition was taken
8  pursuant to Notice.

9                              I N D E X

10 WITNESS:                                                    PAGE

11     JAWAUN MICHAEL LEWIS, D.O.

12     Direct Examination by Mr. Heipt........................3
       Cross Examination by Ms. Ah Loy......................204
13     Redirect Examination by Mr. Heipt....................220
       Recross Examinatoin by Ms. Ah Loy....................224
14

15 WITNESS CERTIFICATION....................................226

16 REPORTER'S CERTIFICATE...................................228

17 EXHIBITS MARKED FOR IDENTIFICATION AND ATTACHED

18 Deposition Exhibit No.   1 - CV
   Deposition Exhibit No.   2 - Cooper email 11-1-2019
19 Deposition Exhibit No.   3 - Dr. Lewis pic/work history
   Deposition Exhibit No.   4 - Responses
20 Deposition Exhibit No.   5 - orientation & training doc
   Deposition Exhibit No.   6 - Segregated inmates docs
21 Deposition Exhibit No.   7 - Contract
   Deposition Exhibit No.   8 - 2019 License Registration
22 Deposition Exhibit No.   9 - 2022 License Registration
   Deposition Exhibit No.  10 - Patient history
23 Deposition Exhibit No.  11 - TKHS Policy and Procedures - pharm

24

25

**EXHIBIT 14**

88

1 (Off the record.)
2 (A recess was taken.)
3 THE VIDEOGRAPHER: Stand by, please. And we're back
4 on.
5 BY MR. HEIPT:
6 Q. Dr. Lewis, we were talking about you being notified about
7 patients who are exhibiting changes in condition and how you
8 would want to know the various things we went over. Do you
9 recall that?
10 A. Yes.
11 Q. And you mentioned your mental health team.
12 A. Uh-huh.
13 Q. At the Sebastian County Jail, who was your mental health
14 team?
15 A. We -- I didn't have a mental health team there. They
16 contracted with -- I think it was West Arkansas Guidance
17 Counseling Center.
18 Q. So if you don't have a mental health team there, then do
19 you need to rely more on your on-site nursing staff?
20 A. No. I'm relying on the mental health team that's
21 contracted.
22 Q. Okay. Good.
23 So let me ask you this: Once you discontinued Larry
24 Price's medication --
25 A. Uh-huh.

**EXHIBIT 14**

89

1   Q.  -- knowing that he had been actively psychotic and knowing
2   that he wasn't taking his medication consistently --
3   A.  Uh-huh.
4   Q.  -- did you then alert the Guidance Center about that and
5   ask them to keep an eye on him and report anything -- any
6   changes in behavior to you?
7   A.  That was not my role.  The Guidance Center referred him to
8   me.  They're supposed to follow up with him and keep up with
9   him.
10  Q.  Right.  But they referred him to you --
11  A.  Uh-huh.
12  Q.  -- for good reason.
13  A.  Uh-huh.
14  Q.  Would you agree?
15  A.  Yes.
16  Q.  But then you took over and they had no idea that you had
17  discontinued his medication.  Don't you think that would be
18  information they would want to know in order to follow up on
19  him?
20          MS. AH LOY:  Object to the form.
21  A.  They're supposed to follow up on him whether or not he's on
22  medications or not.
23  BY MR. HEIPT:
24  Q.  Okay.  And how are they supposed to do that?
25  A.  It could be -- if he's in seg, then standard of care is

**EXHIBIT 14**

| | |
|---|---|
| 1 | they are supposed to be seen weekly by the mental health team. |
| 2 | Q.  Now, isn't that the standard of care for the nursing staff |
| 3 | as well? |
| 4 | A.  No. |
| 5 |       MS. AH LOY:  Object to the form. |
| 6 | A.  No. |
| 7 | BY MR. HEIPT: |
| 8 | Q.  What's that? |
| 9 | A.  No. |
| 10 | Q.  Why do you say that? |
| 11 | A.  Because it only applies to the mental health team.  Nursing |
| 12 | is not responsible for the psychiatric care and treatment of |
| 13 | the inmate. |
| 14 | Q.  They're not responsible -- the healthcare staff is not |
| 15 | responsible for seg rounds? |
| 16 | A.  No.  Just the mental health team does seg rounds. |
| 17 | Q.  Is that the case in all of Turn Key jails? |
| 18 | A.  Yes -- |
| 19 | Q.  Now -- |
| 20 | A.  -- that has mental health. |
| 21 | Q.  In Turn Key jails where there is no mental health -- are |
| 22 | there Turn Key jails where there is no mental health at all? |
| 23 | A.  Yes. |
| 24 | Q.  Not even a contract mental health provider? |
| 25 | A.  Yes. |

**EXHIBIT 14**

97

1  BY MR. HEIPT:
2  Q.  Are Turn Key's healthcare policies and procedures the same
3  in every jail in which Turn Key contracts to provide
4  healthcare?
5         MS. AH LOY:  Same objections.
6  A.  They can vary depending on the facility --
7  BY MR. HEIPT:
8  Q.  Okay.  And that's --
9  A.  -- under contract.
10 Q.  Sorry.  I didn't mean to interrupt.
11 A.  That's okay.  I say they can vary based on the facility and
12 the contract.
13 Q.  Okay.  So that leads me to my next question.  Are Turn
14 Key's policies for large site jails different than for small
15 site jails?
16 A.  Yes.  If they have a -- complete services, 24-hour
17 services, et cetera, that would be different than if they only
18 contract with just psych or just mental health.
19 Q.  Right.  But is there an automatic difference for large site
20 versus small site facilities?
21        MS. AH LOY:  Object to the form, and foundation.
22 A.  I don't know if there's an automatic difference.  Some
23 facilities, like I said, have 40 plus hours of psych, some
24 facilities have 120 hours of mental health, so it would depend
25 on the contract and the facility.

**EXHIBIT 14**

155

1  A. I think he had about 40 something percent, yes.
2  Q. In addition to his less than 75 percent compliance, you had
3  a visit scheduled with him at the end of November 2020,
4  correct?
5  A. Correct.
6  Q. And this was the visit you scheduled as part of your 90-day
7  follow-up plan?
8  A. Yes, and that is -- it was also to try to convince him more
9  to take his medication or it would be stopped, but...
10 Q. And if you look at the bottom of the page marked TKHC 86...
11    Are you there?
12 A. Yes.
13 Q. If we look at that page, can we see that the appointment
14 that was created on September 1st, 2020, was scheduled for
15 November 24, 2020, just about 90 days later?
16 A. Yes.
17 Q. And if we look at the next page, can we see that the
18 appointment never took place because Mr. Price refused to be
19 seen for that appointment?
20 A. Yes.
21 Q. And now can you turn to the page marked TKHC 0048?
22 A. Yes.
23 Q. Do you see at the bottom of the page where it identifies
24 Mr. Price's BuSpar prescription which you ordered on
25 September 1st?

**EXHIBIT 14**

```
                                                          156
1    A.   Yes.
2    Q.   And please turn to the next page.  Do you see where it says
3    that that prescription was discontinued?
4    A.   Yes.
5    Q.   And below that, under system notes, do you see where it
6    says that the prescription was canceled by you on November 24,
7    2020, because Mr. Price refuses to take?
8    A.   Yes.
9    Q.   And that was the day of your scheduled visit, correct?
10   A.   Correct, I believe.
11   Q.   That was the same date he failed to show up for his
12   appointment with you, correct?
13            MS. AH LOY:   Object to the form.
14   A.   I believe so.
15   BY MR. HEIPT:
16   Q.   And at the bottom of this page and the top of the next does
17   it show that you canceled his antipsychotic medication for the
18   same reason?
19   A.   Yes.  Says refused to take.
20   Q.   Are you familiar with Turn Key policy J29, which pertains
21   to pharmaceutical and medication management?
22   A.   No, I'm not.
23   (Deposition Exhibit No. 11 was marked for identification.)
24   Q.   If you turn to the second page and look at Section 7, I'm
25   wondering if you're familiar with that provision which provides
```

**EXHIBIT 14**

```
                                                              205
 1   Q.   Was there originally a liaison position in the contract
 2   between Turn Key and Sebastian County?
 3   A.   Yes.  I think that was included in the original contract,
 4   but I think the County didn't want that position.
 5   Q.   So was that eliminated?
 6   A.   Yes.
 7   Q.   The change in practices you talked about earlier in your
 8   deposition and not discontinuing meds for non-compliance in
 9   segregation --
10   A.   Uh-huh.
11   Q.   -- was that a remedial measure in response to Larry Price's
12   death?
13   A.   Yes.
14   Q.   The same thing, the change about no longer working with
15   outside agencies for mental health, was that a remedial measure
16   in response to Larry Price's death?
17   A.   Absolutely.
18   Q.   Can a person who stops eating lose 30 pounds in three
19   months?
20   A.   Yes.
21   Q.   What about two months?
22   A.   That's possible, too.
23   Q.   One month?
24   A.   One month is pushing it, but it's possible if they had some
25   type of illness and wasn't eating any food.  Yeah, it's
```

EXHIBIT 14

206

1  possible.
2  Q. How long in general would someone who weighs 150 pounds and
3  is thin survive if they're not eating at all?
4  A. If they're really thin, I would say at the most -- two to
5  four weeks at most.
6  Q. If someone of any weight or stature stops drinking
7  entirely, how long could they survive?
8  A. That would be sooner. I would say within a week.
9  Q. Would you expect nurses to notify you if they received food
10 logs indicating that Mr. Price was eating food?
11 A. No.
12 Q. And you saw the food logs in this case?
13 A. Yes.
14 Q. Was there anything in those food logs you saw that would
15 have made you expect a nursing modification to be made?
16 A. Absolutely not.
17 Q. Was your physician-patient relationship with Mr. Price
18 terminated when you discontinued medications on November 24th,
19 2020?
20 A. Yes.
21 Q. Did you owe Mr. Price any ongoing duty of care after you
22 terminated that physician-patient relationship?
23 A. No. The only way that I would re-establish a relationship
24 is if he requested to see me again; security, mental health or
25 medical requested for me to see a patient again.

**EXHIBIT 14**

```
                                                           207
1    Q.  If you are not actively prescribing medications to an
2    inmate, are they considered your patient?
3    A.  No.
4    Q.  When you had the meeting at the Guidance Center where you
5    discussed mental health operations in the jail, did you
6    specifically discuss that Turn Key's mental health
7    professionals do weekly segregation rounds?
8    A.  Yes.
9    Q.  Did they express to you that they would be doing that as
10   well?
11   A.  Yes.
12   Q.  When you talked about the policies that were provided to
13   the Guidance Center earlier, would that have been copies of
14   Turn Key's mental health policies?
15   A.  I believe so, yes.
16   Q.  Did the Guidance Center indicate to you that they were
17   going to emulate Turn Key's policies?
18   A.  Yes.
19   Q.  Did you discuss with the Guidance Center your expectation
20   mental health would be your eyes and ears in the facility?
21   A.  Absolutely.
22   Q.  Did they tell you that they would do that?
23   A.  Yes.
24   Q.  Did you discuss with the Guidance Center your expectation
25   that they would let you know if there were any issues with
```

**EXHIBIT 14**

212

1  Q. Can N.C.C.H.C. guidelines be applied in every single jail?
2  A. No, it's possible.
3  Q. Was Mr. Price eating his feces or drinking his urine when
4  you observed him?
5  A. No.
6  Q. When you interacted with Mr. Price, did you believe that he
7  needed to be emergently transferred to an inpatient psychiatric
8  facility?
9  A. Not at the time I saw him, no.
10 Q. If an inmate had a history or was observed eating their
11 feces or drinking urine, would detention staff usually tell you
12 about that?
13 A. Typically, yes.
14 Q. Have detention staff ever told you about things like that?
15 A. No.
16 Q. Why is it important for patients to be compliant with
17 psychiatric medication?
18 A. Because we depend on a certain therapeutic level to manage
19 their psychosis and those levels can never be reached if
20 they're not compliant with medicines and can actually increase
21 their mood swings and make their condition worse.
22 Q. Does a therapeutic level mean -- what does therapeutic
23 level mean?
24 A. Therapeutic level is assuming that someone is 90 -- at
25 least 90 plus percent compliant with medications.

**EXHIBIT 14**

213

1   Q.  Is that when the medications start taking effect?
2   A.  Yes.
3   Q.  Is that what therapeutic level is?
4   A.  Yes.
5   Q.  Can a patient reach a therapeutic level if their compliance
6   is less than 50 percent?
7   A.  No.
8   Q.  If they never reach a therapeutic level, is there a medical
9   benefit in receiving those medications?
10  A.  Absolutely not.  It actually can cause harm.
11  Q.  Before you discontinued Mr. Price's medications for
12  non-compliance, did you attempt to meet with him?
13  A.  I had an appointment scheduled and he refused as I recall.
14  Q.  Did you plan on talking to him about compliance?
15  A.  Absolutely.
16  Q.  After a patient receives a psychiatric appointment with
17  you, do you have a duty to continue trying to make follow-up
18  appointments?
19  A.  No, huh-uh.
20  Q.  If a mental health counselor refers a patient to you for
21  psychiatric services, does that mean that counselor no longer
22  has to see the patient?
23  A.  No.  So when they refer for treatment, then the assumption
24  is as if I am a primary care doctor and I'm referring to a
25  neurologist for treatment.  A neurologist send the patient back

**EXHIBIT 14**

215

1   see them in 90 days.  Sometimes security or mental health say,
2   hey, I think you need to see this guy, and I'll schedule them
3   sooner.  But typically, just so that I have a -- I always have
4   an appointment on the book and they're not missed, I set a
5   90-day follow-up.
6   Q.  Did you have any control over what inmates were housed in
7   the jail?
8   A.  No.  That's a security issue.
9   Q.  Did you know at any point in time that Mr. Price was not
10  being rounded on by the Guidance Center?
11  A.  No.
12  Q.  Was that surprising when you learned that?
13  A.  Yes.  That was very, very disheartening.
14  Q.  Was that a breach in the standard of care for them?
15  A.  Yes.  They should have been seeing him weekly.
16  Q.  Was it your responsibility to supervise the Guidance
17  Center?
18  A.  No.
19  Q.  Was it Turn Key's responsibility to supervise the Guidance
20  Center?
21  A.  No, that was not our contract.
22  Q.  Was it your responsibility to check whether they were doing
23  the weekly checks?
24  A.  I wasn't there as supervisor.
25  Q.  Did you have any reason to believe before Mr. Price's death

EXHIBIT 14

```
                                                              216
 1   that they weren't doing weekly checks on inmates in seg?
 2   A.  No, I did not.
 3   Q.  Are mental health professionals also considered under the
 4   umbrella of healthcare staff?
 5   A.  Yes.
 6   Q.  Are mental health professionals trained to identify
 7   potential serious medical issues while conducting rounds?
 8   A.  Happens all the time.  Our team will say, Doc, this patient
 9   isn't looking well, and they'll refer to medical.  And, Doctor,
10   the patient is having an MI.  So that happens quite frequently
11   with our team.
12   Q.  There has been a lot of testimony about Dr. Cooper.  I just
13   wanted to make sure the record's clear.  Is his title Chief
14   Medical Officer?
15   A.  Yes.
16   Q.  Beyond a formulary, does Turn Key have any written
17   guidelines that dictate how psychiatric nurse practitioners are
18   supposed to provide psychiatric services?
19   A.  No, and we -- actually, we don't have a formulary now.
20   Q.  You don't use a formulary anymore?
21   A.  No.
22   Q.  Do you ever consider costs in making psychiatric decisions?
23   A.  I've never one time had my boss ask me about cost of
24   medicines for treatment.
25   Q.  Do you care about cost?
```

EXHIBIT 14