```
                IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF ARKANSAS
                        FORT SMITH DIVISION

THE ESTATE OF LARRY EUGENE
PRICE JR, by and through its Special
Administrator, Rodney Price,                              PLAINTIFF

    vs.                             Case No:  2:23-cv-02008-PKH

TURN KEY HEALTH CLINICS, LLC, et al,                     DEFENDANTS

              The video/audio-recorded Deposition of:

                         CHRISTEENA FERGUSON
            being taken on November 14, 2023 @ 9:04 a.m.
         at the Judge's Room, Courtyard Marriott Downtown,
            900 Rogers Avenue, Fort Smith, Arkansas  72901


APPEARANCES:                                         ON BEHALF OF:

MR. ERIK J. HEIPT                                         PLAINTIFF
MR. HANK BALSON
MR. ED BUDGE (via Zoom)
Budge & Heipt
808 East Roy Street
Seattle, WA  98102

MS. ALEXANDRA G. AH LOY                                  DEFENDANTS
MR. ZACHARY WILLIAMS (via Zoom)
Hall Booth Smith, PC              Turn Key Health Clinics, LLC
6301 Waterford Blvd., Ste 200     Jawaun Lewis, D.O.
Oklahoma City, OK  73118          Christeena Ferguson

MR. JASON OWENS                   Sebastian County, Arkansas
Jason Owens Law Firm, P.A.
1312 W. Oak Street
Conway, AR  72034

Other persons present:  Rodney Price; David Roe, videographer



                    RICK L. CONGDON, ARCCR #631
                      CERTIFIED COURT REPORTER
                          P. O. Box 8493
                     Fort Smith, Arkansas 72902
       email: rlcongdon@hotmail.com / cell phone: 479-652-0146
```

EXHIBIT 15

1        The video/audio-recorded deposition of Christeena Ferguson

2   was taken on November 14, 2023, beginning at the hour of 9:04

3   a.m. at the Judge's Room, Courtyard Marriott Downtown, 900

4   Rogers Avenue, Fort Smith, Arkansas, before me, Rick L.

5   Congdon, a Certified Court Reporter, and for the cause now

6   pending in the United States District Court, Western District

7   of Arkansas, Fort Smith Division, said deposition was taken

8   pursuant to Notice.

9                              I N D E X

10  WITNESS:                                                    PAGE

11     CHRISTEENA FERGUSON

12     Direct Examination by Mr. Balson.......................3
       Cross Examination by Ms. Ah Loy......................211
13     Cross Examination by Mr. Owens.......................218
       Redirect Examination by Mr. Balson...................226
14     Recross Examination by Mr. Owens.....................233
       Recross Examination by Ms. Ah Loy....................233
15

16  WITNESS CERTIFICATION.....................................235

17  REPORTER'S CERTIFICATE....................................237

18  EXHIBITS MARKED FOR IDENTIFICATION AND ATTACHED

19  Deposition Exhibit No.  1 - Resume
    Deposition Exhibit No.  2 - Power Point modules doc
20  Deposition Exhibit No.  3 - HSA job description
    Deposition Exhibit No.  4 - TK Small Sites Quarterly Audit doc
21  Deposition Exhibit No.  5 - New Hire Employee Orientation doc
    Deposition Exhibit No.  6 - TK Policy & Procedures doc
22  Deposition Exhibit No.  7 - Patient History doc
    Deposition Exhibit No.  8 - Blank I/O record
23  Deposition Exhibit No.  9 - I/O record used
    Deposition Exhibit No. 10 - Personnel Action Form docs
24  Deposition Exhibit No. 11 - Request Report doc
    Deposition Exhibit No. 12 - Email doc of 10-18-2020
25  Deposition Exhibit No. 13 - 11-19-2020 doc
    Deposition Exhibit No. 14 - Responses

EXHIBIT 15

6

1  Q. Can you tell me what you reviewed?
2  A. Captain Dumas's deposition.
3  Q. Anything else?
4  A. No.
5  Q. Do you remember Larry Price?
6  A. Yes.
7  Q. Tell me what you remember about him.
8  A. To what context?
9  Q. What -- just generally, not every detail, but what stands
10 out to you when you think about Larry Price?
11 A. He was in ad seg so he was in a cell by himself.  He was
12 very violent.  He was non-compliant a lot with medications,
13 following orders with the deputies.  I think that's broad for
14 now.
15 Q. Do you remember anything about his appearance?
16 A. Which time?
17 Q. So did you see him on more than one --
18 A. Yes.
19 Q. -- more than one of his detentions?
20 A. No.
21 Q. Okay.  So maybe -- when was the first time you remember
22 seeing him?
23 A. It had to have been on med pass.  I don't remember when --
24 what med pass.  He came into the jail right at the same time
25 That I started at the jail, I think within days.  So typically

**EXHIBIT 15**

7

1  I wouldn't see them as the HSA unless there as a problem or
2  medical care that needed -- that my nurses couldn't handle.  So
3  sometimes I would have to come in and do med pass.  And then
4  the day that we got the request in in Request Manager from the
5  other inmate, then that was the last time I saw him.
6  Q.  And to clarify, when you started working at Sebastian
7  County Jail, you were a float nurse, is that right?
8  A.  I believe so, yes.
9  Q.  And then you became HSA in the fall?
10 A.  Shortly after, yes.
11 Q.  Do you recall -- when you saw Mr. Price for med pass, do
12 you recall whether that was while you were a float nurse or
13 HSA?
14 A.  I don't remember.
15 Q.  Was there any difference between the way Mr. Price looked
16 when you saw him for med pass and when you saw him in January
17 in response to the other inmate's request?
18 A.  Yes.
19 Q.  Describe that difference.
20 A.  I did notice that he was a little thinner, that he had lost
21 some weight, because it had been some time in between seeing
22 him so it's easier to spot that.
23 Q.  Did you notice any other differences?
24 A.  No.
25 Q.  Do you remember anything about his mental state or mental

EXHIBIT 15

8

1  condition at the jail?
2  A.  He seemed to be angry.  Like I said, he was violent.  He
3  did not like a lot of people, detention, nursing staff.  But we
4  deal with a lot of inmates that don't want to be there.  But
5  every time I saw him he was coherent and he would answer my
6  questions and he would -- if I asked him, like, orientation
7  questions, what month is it?  He also would know the timing of
8  when we came up to the door to know when to throw feces and
9  urine out from under the door to get our feet.  But nothing
10 that really stood out.  And I'm not a psychologist, so...
11 Q.  Were you ever aware at any time during that -- well, I
12 realize you weren't there the entire time that Larry was there,
13 but for the period that you were there, were you ever aware
14 that he had a mental illness?
15 A.  I remember that he was on psychiatric meds and that we
16 would try to give those to him.  Sometimes he would take them.
17 Most of the time he would throw them in his cell, throw them
18 back at us.  He put them in his mouth and, like, pretend like
19 he would swallow them and then spit it out.  So...
20 Q.  Based on the fact that he had been prescribed psychiatric
21 medication, did you understand that to mean that he probably
22 had a mental illness?
23 A.  Most likely.
24 Q.  And did you ever look at his chart?
25 A.  What do you mean?

**EXHIBIT 15**

```
                                                                   121
 1    A.   Yes.
 2    Q.   Was he in BC segregation at the time?
 3    A.   I believe all of BC is segregation.
 4    Q.   My understanding, and correct me if I'm wrong, is that
 5    there's a main BC pod and then outside the main pod there's two
 6    segregation cells.  He was in one; Calvin Jackson was in the
 7    other.  Is that how you remember it?
 8    A.   He was in the pod, the big pod.
 9    Q.   Okay.  At the time of this incident?
10    A.   Yes.
11    Q.   Got it.
12         Did anyone go with you to check on him?
13    A.   The deputy.
14    Q.   Who was that?
15    A.   I don't remember.
16    Q.   Was it the deputy assigned to BC pod at the time?
17    A.   Yes.
18    Q.   Was it just the one deputy?
19    A.   Yes.
20    Q.   Describe your encounter with Mr. Price in as much detail as
21    you can remember.
22    A.   So I left the nurses' office and I went to BC pod.  I asked
23    open the door.  I let the deputy know that I needed to see
24    Mr. Price because we got a request of him eating his feces and
25    urine.  I needed to see him.  He said okay.  And then we went
```

**EXHIBIT 15**

122

1  to the other -- the other door.  We went up the stairs.  We
2  walked around to his cell and I looked in his cell -- excuse
3  me -- and he was holding his white tumbler cup in his right
4  hand.  And he walked over to the door and I said, "Hey,
5  Mr. Price."  And at that time there was another inmate that was
6  out on his hour out, like, walking down the stairs and he said,
7  "Ferg, I was the one that put in that request; you need to
8  check on him."  And I was, like, "Okay, I'm doing it."  And so
9  I looked at him and he didn't have a shirt on.  And I said,
10 "Hey, how you doing, Mr. Price?"  And he was, like, "What the
11 fuck you want?"  And I said, "Hey, man, what's going on?  How
12 are you?"  And I don't remember what he said after that.  And
13 then I asked him -- I was, like, "Hey, can I ask you some
14 questions?"  And he said something else, but then was, like,
15 "Okay, where you at right now?" and "I'm in fucking jail."  And
16 then I said, "What month is it?"  And then he said something
17 else.  He looked at the deputy.  He said something else.  I
18 don't think he really liked the deputy he was with.  And I was,
19 like, "Hey, just talk to me; it's just me.  We're just talking;
20 we're having a conversation."  And then I said, "Are you okay?
21 Do you need anything?  Do you want to see the doctor?"  And he
22 was, like, "No."  I think that's -- I mean, I was assessing
23 him, looking at him.  He did look thinner than the last time I
24 saw him.  He made eye contact with me.  He could answer the
25 questions.  He did get the year wrong.  And I think I started

EXHIBIT 15

123

1  to aggravate him a little bit because after I asked him those
2  questions he started to get a little mad.  He was, like, "Fuck
3  off, fuck you."  So...
4  Q.  Roughly how long were you interacting with him before he
5  got to that point?
6  A.  Maybe three minutes.
7  Q.  What did you do when he started to demonstrate agitation?
8  A.  I said, "All right, man; I just wanted to check on you.
9  Let us know if you need anything."
10 Q.  Did he act out in any way other than cussing you out?
11 A.  Huh-uh.
12          THE COURT REPORTER:  Your answer?
13 A.  No.  Sorry.
14 Q.  You were communicating with him through the cell door,
15 correct?
16 A.  Yes.
17 Q.  So the door wasn't open?
18 A.  Correct.
19 Q.  You said he had a shirt on.  Did he have pants or underwear
20 on?
21 A.  I don't know.
22 Q.  Was he right up at the window?
23 A.  At first he came close to the window and then he kind of
24 backed off a little.  So he was maybe a couple feet away from
25 the door.

EXHIBIT 15

124

1  Q. Could you see him from the waist down?
2  A. No.
3  Q. You wrote, as you just mentioned, patient noticeably
4  thinner. Thinner than when? When was the last time you had
5  seen him?
6  A. It was either on pill pass or the ER visit.
7  Q. Did you notice anything about the condition of his cell
8  during that encounter?
9  A. Not that one.
10 Q. Did you notice if there was urine or feces in the cell?
11 A. No.
12 Q. I'm guessing that because he was close to the window you
13 didn't have a good view of the cell, is that right?
14 A. Correct.
15 Q. When you first came to the cell, what was Mr. Price doing?
16 Was he sitting on the bed? Was he pacing? Do you recall?
17 A. By the time I got over to his door he was -- when I first
18 saw him he was standing up over by the water, his water
19 fountain, and so he was already standing. And then as we came
20 closer to the door, saw him, and then he walked up closer. And
21 he had his white tumbler in his hand. So...
22 Q. Did you ask Mr. Price anything about eating his feces or
23 drinking his urine?
24 A. I don't believe so.
25 Q. Did you do any -- well, since the door was closed I'm

EXHIBIT 15

125

1 guessing you couldn't do any sort of physical exam, correct?
2 A. Correct.
3 Q. So you weren't able to listen to his heart or his lungs?
4 A. Correct.
5 Q. You weren't able to do an abdominal exam?
6 A. Correct. But his -- he was breathing regularly. His skin
7 was normal color. There wasn't any signs of, like I said,
8 respiratory or cardiac distress. He wasn't sweating. He
9 wasn't breathing rapidly. There wasn't anything that concerned
10 me at that time.
11 Q. In terms of an emergent situation?
12 A. Correct.
13 Q. So based on that encounter you weren't able to confirm
14 whether or not he actually was eating his feces and drinking
15 his urine? Is that accurate?
16 A. Nobody reported to me that they saw it. I believe that I
17 asked the deputy, when I told him that we got a request that he
18 was eating his feces and urine, have you seen it? And I
19 believe -- it was a male, and I believe he was, like, "Eww,
20 no." I think that was his response.
21 Q. The deputy?
22 A. Yes.
23 Q. Based on the information from that encounter, were you able
24 to either confirm or rule out the concern about a hunger
25 strike?

EXHIBIT 15

1  A.  Can you ask that again?
2  Q.  Sure.  So I think you said that when you first heard about
3  the -- first heard the request that came into Request Manager
4  it triggered a concern about possible hunger strike, is that
5  right?
6  A.  Correct.
7  Q.  After your interaction with Mr. Price, were you able to
8  either confirm or rule out that concern?
9  A.  You can't at that time.
10 Q.  So you had -- you had heard -- you weren't able to confirm
11 it, but you had heard from another inmate that Mr. Price was
12 eating his feces and drinking his urine.  If that were true,
13 would that be a serious concern to you?
14 A.  If I saw it happen, yes.
15 Q.  Or if it were confirmed by somebody else?
16 A.  If a deputy had seen it, yes.
17 Q.  Do you dismiss observations by other inmates?
18         MS. AH LOY:  Object to the form.
19 A.  Some inmates, especially in that pod, will try to get other
20 inmates that are in the pod being disruptive out of that pod.
21 It's really loud in there.  I -- he would -- he would yell and
22 be loud a lot and he would flood his cell, which would then
23 tower down to the cells below.  So sometimes inmates will say
24 things about other inmates to get those inmates out of there
25 because they're disrupting the pod.  I obviously didn't dismiss

EXHIBIT 15

1  it because I went and saw him.
2  Q.  Did -- have you ever experienced that before, when another
3  inmate reported somebody they wanted to get out of the pod,
4  that they were eating their feces or drinking their urine?
5  A.  Not that specifically, but other situations, yes.
6  Q.  Assuming it's true -- well, let me ask you.
7      You couldn't confirm it with other observations or with
8  your own observations, but did you rule out the possibility
9  that it was true that Mr. Price was eating his feces and
10 drinking urine?
11 A.  I couldn't rule out that he wasn't, but when he talked to
12 me his mouth was clean.  I didn't see any feces or anything
13 that looked like feces in his mouth, around his mouth, on his
14 clothes or his skin and so I can't confirm it or not because I
15 didn't see it happen.
16 Q.  Right.  If a patient was eating his feces and drinking his
17 urine, would you consider that a serious concern?
18         MS. AH LOY:  Object to form.
19 A.  If I saw it happen, yes.
20 BY MR. BALSON:
21 Q.  Or if for one way or another you knew it was happening?
22         MS. AH LOY:  Object to the form.
23 BY MR. BALSON:
24 Q.  I'm asking you to assume it was happening.
25 A.  I don't want to assume because I didn't see it.

EXHIBIT 15

128

1  Q. No. I understand that. I'm not asking you to assume
2  Mr. Price was doing that. I'm asking you to assume generally.
3  If a patient -- if you learned that a patient is eating their
4  own feces and drinking their urine, is that a serious concern
5  to you?
6       MS. AH LOY: Object to the form.
7  A. If I saw it happen, yes. If a deputy told me I saw this
8  happen, yes. If another inmate said I saw this happen, then we
9  would probably put him in a camera cell.
10 BY MR. BALSON:
11 Q. You -- well, didn't -- didn't another inmate say he saw
12 this happen?
13 A. He just said that he was eating his own feces and urine.
14 He didn't say that he saw it happen. He said, "Ferg, he's
15 eating his own shit."
16 Q. So you would have wanted to know if he saw it with his own
17 eyes?
18 A. I wouldn't want to get that inmate involved in another
19 inmate's care. I took the request. When I was standing at
20 Larry Price's cell, the other inmate that put in the request
21 said what he said to me.
22 Q. Did you ask that other inmate if he saw it?
23 A. No.
24 Q. So you said that the door was closed, but you could tell
25 that Mr. Price had lost weight, correct?

EXHIBIT 15

129

1  A. Yes.
2  Q. It was enough weight that you noticed it?
3  A. Yes.
4  Q. It was enough weight that you asked the deputies to weigh
5  him, correct?
6  A. I initiated what I initiated because I wanted to get a
7  baseline just in case it was what was going on, and with the
8  food log, with getting weighed. I noticed it in his face. It
9  was just a little more slender. And people that are in jail
10 usually lose weight because they're on a calorie supplement --
11 I mean, they're on a -- a diet that is calorie sufficient, not
12 McDonald's or other things. So typically inmates do lose
13 weight, but I didn't want to risk this falling through the
14 cracks. That's why I initiated everything.
15 Q. Did this look like a little more of a weight loss than what
16 you typically see with most --
17 A. No.
18 Q. -- people in the jail?
19 A. No, but that combined with the eating own feces and urine,
20 I just wanted to make sure that he was eating properly and he
21 was having intake and not not eating.
22 Q. You wrote, "Had deputies weigh patient and start a food log
23 to monitor intake and output." How many deputies are you
24 referring to there that you asked to weigh him and start a food
25 log?

**EXHIBIT 15**

136

| | |
|---|---|
| 1 | needs to happen. |
| 2 | Q. So after speaking with Captain Dumas, you went back to the |
| 3 | unit, is that right, to BC pod? |
| 4 | A. Yes. |
| 5 | Q. And you were there until Mr. Price was weighed? |
| 6 | A. Yes. |
| 7 | Q. Approximately how long did that take? |
| 8 | A. Maybe five minutes. |
| 9 | Q. Did you write down Mr. Price's weight, like, on a piece of |
| 10 | paper you had with you or you just remembered it? |
| 11 | A. I probably wrote it down. |
| 12 | Q. What did you do next? |
| 13 | A. I went to the nurses' office. I told Tierra what was going |
| 14 | on. I looked for a in-and-out log through our binders. I |
| 15 | charted my note and then I -- I possibly went -- I don't know |
| 16 | if I went back to Dumas's office first or if I went back to BC |
| 17 | pod. And I gave a stack of papers, the in-and-out logs, to the |
| 18 | deputy and I said, "Hey, this is what we need to do. This is |
| 19 | how you fill this out. We need this every shift." Then I |
| 20 | don't know the order in which Dumas knew about them, and then |
| 21 | that would transfer down to all the sergeants and the corporals |
| 22 | and then they would know about it, and then it was their job to |
| 23 | pass it on to the deputies in the pod. |
| 24 | Q. The deputy that you gave the in-and-out logs to, was that |
| 25 | the same deputy that accompanied you to Mr. Price's cell when |

**EXHIBIT 15**

215

1  A.  Yes.
2  Q.  Would your average person know what "fluid intake" means?
3         MR. BALSON:  Objection, foundation.
4  A.  I would assume so, yes.
5  BY MS. AH LOY:
6  Q.  What about "food intake"?
7  A.  Yes.
8  Q.  Does the average person know what "vomiting" means?
9  A.  Yes.
10 Q.  Does your average person know what "urine output" means?
11 A.  I would assume, yes.
12 Q.  What about "bowel movements"?
13 A.  Yes.
14 Q.  Does your average person know what "total" means?
15 A.  Yes.
16 Q.  Were you concerned that nothing was written on output on
17 the food logs?
18 A.  I was not concerned with that, no.
19 Q.  Earlier you testified you were more concerned about intake.
20 Did I hear that correctly?
21 A.  Yes.
22 Q.  Did Mr. Price have continuous access to water in his cell?
23 A.  Yes.
24 Q.  Was there anything concerning to you in the food logs that
25 you received from Mr. Price?

**EXHIBIT 15**

216

1  A. No.
2  Q. Were they reassuring?
3  A. Yes.
4  Q. Based on the food logs that were received, did you believe
5  Mr. Price was suffering from a serious medical condition that
6  warranted further follow-up by medical staff?
7  A. No.
8  Q. Considering the gaps in the food logs, would you be
9  concerned by the information being submitted to medical staff
10 in the food logs that were submitted?
11 A. No.
12 Q. Is there anything in the food logs that were submitted to
13 medical staff that would have prompted further follow-up by
14 medical staff?
15 A. No.  They're -- they're reassuring the fact that he was
16 eating and not starving himself.
17 Q. Did any detention staff member ever notify you of any
18 concerns regarding Mr. Price's weight or his nutritional
19 status?
20 A. No.
21 Q. Are you aware of any detention officer notifying any
22 medical staff member of any concerns about Mr. Price's weight
23 or his nutritional status?
24 A. Not while I was there.
25 Q. You referenced a sick call log way earlier in your

**EXHIBIT 15**